[Cite as *Berry v. Berry*, 2014-Ohio-4874.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY


KRISTI L. BERRY,

    PLAINTIFF-APPELLEE,          CASE NO.  5-14-06

    v.

CLINTON D. BERRY,              O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Hancock County Common Pleas Court
Domestic Relations Division
Trial Court No. 2009 DR 189

**Judgment Affirmed**

Date of Decision:   November 3, 2014


APPEARANCES:

    *John C. Filkins* for Appellant

**SHAW, J.**

{¶1} Defendant-appellant, Clinton D. Berry ("Clinton"), appeals the April 7, 2014 judgment of the Hancock County Court of Common Pleas, Domestic Relations Division, designating plaintiff-appellee, Kristi L. Berry ("Kristi"), as the residential parent of their minor child and granting Clinton parenting time as the non-residential parent. In a separate decision, the trial court overruled Clinton's objections to the Magistrate's decision, which recommended that the trial court overrule Clinton's motion to designate him as the child's residential parent and his motion to adopt his shared parenting plan.

{¶2} The parties were married on September 25, 1999, and had one child, Brian, born in April of 2004. On August 5, 2009, the parties divorced. The divorce decree stated the following with regard to the custody of the parties' child. "There is no allocation of parental rights and responsibilities as the Hancock County Juvenile Court has exercised jurisdiction in two cases: 20830043 and 20934036. Future modification or allocation of parental rights shall be handled by the Juvenile Court." (Doc. 34 at 2). The record reflects that the Juvenile Court cases were dependency and neglect proceedings involving Brian when he was in the care of Kristi and his paternal-grandmother while residing in Findlay, Ohio in 2008. At the time, Clinton remained in Georgia attempting to sell the parties' home and then subsequently relocated to join the family.

{¶3} According to certain judgment entries issued by the Juvenile Court which were incorporated into the record of the Domestic Relations case, Brian was removed from the parties' custody and placed with his maternal grandmother. Both parties underwent psychological evaluations and were ordered to comply with the case plan objectives put into place by the Hancock County Children's Protective Services Unit ("CPSU").

{¶4} On October 2, 2009, upon consent of the parties, Brian was returned to Kristi's custody under protective supervision by CPSU. Clinton was granted parental visitation. CPSU's protective supervision was terminated several months later and jurisdiction over Brian was eventually transferred from the Juvenile Court to the Domestic Relations Court.

{¶5} On July 21, 2011, Clinton filed a motion to designate him as Brian's residential custodian and legal guardian. The parties disputed the appropriate legal standard to be applied to Clinton's motion. Specifically, Clinton argued that because the Domestic Relations Court had yet to make an allocation of the parties' parental rights and responsibilities, the trial court must only determine whether designating him as the residential parent is in Brian's best interest since no prior allocation was made by the Domestic Relations Court. For her part, Kristi maintained that the October 2, 2009 Judgment Entry of the Juvenile Court issued during the dependency and neglect proceedings, in which the Juvenile Court

returned Brian to Kristi's custody under protective supervision and granted Clinton parental visitation, was a prior allocation of the parties' parental rights and responsibilities. Therefore, Kristi argued that Clinton must establish that a "change in circumstances," as set forth in R.C. 3109.04(E), had occurred since the prior Juvenile Court custody order before the Domestic Relations Court could modify the parties' parental rights and responsibilities.

{¶6} On December 9, 2011, the Magistrate issued an order finding that the "change in circumstances" analysis was the appropriate legal standard to be applied to the case.

{¶7} On February 17, 2012, the trial court issued a judgment entry journalizing the parties' agreement for temporary parenting time during the pendency of the case. Commencing on January 13, 2012, Clinton was entitled to parenting time on alternate weekends and one mid-week overnight every Tuesday. The parties also agreed to offer the other parent additional parenting time if either party was required to work on their scheduled weekend before engaging another child care provider, and further agreed to exercise Holiday parenting time pursuant to the local rules of court.

{¶8} On March 6, 2012, Clinton filed a motion to adopt a shared parenting plan and later filed an amended proposed shared parenting plan.

{¶9} On March 8, 2012, the Guardian ad litem ("GAL") assigned to the case filed his report with the court.

{¶10} The case was heard by the Magistrate on March 27, 2012, May 31, 2012, August 9, 2012, and August 10, 2012. During the proceedings, Clinton's counsel moved to admit the testimony of Dr. Darlene Barnes, a psychologist who evaluated Clinton and Kristi three years earlier in 2009 during the dependency and neglect cases in the Juvenile Court. Upon inquiring further as to the necessity and propriety of Dr. Barnes' testimony, the Magistrate concluded that Dr. Barnes' testimony regarding her 2009 psychological evaluation of Kristi was not relevant to establish a "change in circumstances." Consequently, the Magistrate ruled that Dr. Barnes' testimony and her 2009 report were inadmissible, except upon Kristi's consent. The Magistrate noted that her ruling was preliminary and subject to reconsideration "upon the presentation of additional evidence establishing some relevance of the prior evaluation." (Doc. No. 137 at 4).

{¶11} During the evidentiary hearings, Clinton presented the testimony of numerous witnesses, the majority of which provided evidence related to the 2008 dependency and neglect cases handled by the Juvenile Court. Notably, several of these witnesses provided testimony regarding Dr. Barnes' 2009 psychological evaluation of Kristi and the Magistrate allowed Dr. Barnes' report to be admitted as an exhibit for limited purposes at the hearings. Kristi provided testimony in

support of her case. The Magistrate also conducted an in camera interview with Brian.

{¶12} On September 12, 2012, the Magistrate issued a thirty-seven page decision thoroughly analyzing the evidence before her and made the following recommendations. The Magistrate concluded that it was in Brian's best interest for Kristi to remain the residential parent. The Magistrate also found that the temporary custody arrangements the parties implemented during pendency of the custody proceedings were appropriate and in Brian's best interest. The Magistrate further recommended expanding Clinton's parenting time to six weeks in the summer.

{¶13} Clinton filed objections to the Magistrate's decision with the trial court and claimed, in relevant part, that the Magistrate failed to apply the appropriate legal standard of "best interest" and instead required a "change in circumstances" be established as a threshold matter; that the Magistrate erred in failing to order Dr. Barnes to comply with Clinton's subpoena and in concluding that Dr. Barnes' testimony and her 2009 psychological evaluation of Kristi were inadmissible; and that the Magistrate erred as a result of her failure to designate Clinton as Brian's residential parent and legal custodian or to adopt Clinton's shared parenting plan.

{¶14} On February 28, 2014, the trial court in its independent review of the legal and factual issues presented in the case overruled Clinton's objections. The trial court adopted the Magistrate's decision and journalized its decision in its April 7, 2014 Judgment Entry.

{¶15} Clinton now appeals, asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED WHEN IT REQUIRED PROOF OF A CHANGE IN CIRCUMSTANCES WHEN THE CORRECT LEGAL STANDARD REQUIRED MERELY PROOF OF WHAT WAS IN THE BEST INTEREST OF THE MINOR CHILD UNDER § 3109.04.**

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED AS A RESULT OF ITS REFUSAL TO PERMIT THE DEFENDANT TO CALL DR. BARNES AS A WITNESS AND AS A RESULT OF ITS FAILURE TO CONSIDER THE EVALUATION OF THE APPELLEE CONDUCTED BY DR. BARNES.**

**ASSIGNMENT OF ERROR NO. III**

**THE TRIAL COURT ERRED AS A RESULT OF ITS FAILURE TO IDENTIFY THE APPELLANT AS THE RESIDENTIAL PARENT AND LEGAL CUSTODIAN OF THE MINOR CHILD, BRIAN BERRY, OR TO ADOPT THE APPELLANT'S SHARED PARENTING PLAN.**

{¶16} For ease of discussion, we elect to discuss the assignments of error together.

Case No. 5-14-06

{¶17} On appeal, Clinton challenges the decision of the Magistrate and the trial court designating Kristi as the residential parent and legal custodian of the parties' minor child.[1] We will address each of Clinton's claims in turn.

{¶18} Clinton argues that the evidence presented at the hearings demonstrates that the trial court erred when it concluded that shared parenting was not in Brian's best interest and that naming Kristi Brian's residential parent and legal custodian was in his best interest. Specifically, Clinton asserts that the Magistrate and the trial court misapplied the best interest factors enumerated in R.C. 3109.04(F)(1), which state as follows.

> **In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:**
>
> **(a)   The wishes of the child's parents regarding the child's care;**
>
> **(b)   If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;**
>
> **(c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;**
>
> **(d)   The child's adjustment to the child's home, school, and community;**

---

[1] We note that Kristi failed to file a brief or otherwise respond to Clinton's claims on appeal.

**(e)  The mental and physical health of all persons involved in the situation;**

**(f)  The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**

**(g)  Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;**

**(h)  Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;**

**(i)  Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;**

> **(j)** **Whether either parent has established a residence, or is planning to establish a residence, outside this state.**

R.C. 3109.04(F)(1).

**{¶19}** Custody issues are some of the most difficult decisions a trial judge must make. Therefore, those decisions rest within the sound discretion of the trial court. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997–Ohio–260; *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). A court's decision regarding an award of custody is subject to reversal only upon a showing of an abuse of that discretion. *Id.*; *Trickey v. Trickey*, 158 Ohio St. 9, 13–14 (1952). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *Bruce v. Bruce*, 3d Dist. No. 9–10–57, 2012–Ohio–45, ¶ 13, citing *State v. Boles*, 187 Ohio App.3d 345, 2010–Ohio–278, ¶ 17–18 (2d Dist.). "A reviewing court will not overturn a custody determination unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious." *Pater v. Pater*, 63 Ohio St.3d 393 (1992).

**{¶20}** The reason for this standard of review is that the trial judge is in the best position to view the demeanor, attitude, and credibility of each witness and to weigh the evidence and testimony. *Davis*, 77 Ohio St.3d at 418. This is especially true in a child custody case, since there may be much that is evident in the parties' demeanor and attitude that does not translate well to the record. *Id.* at 419.

> **[I]t is inappropriate in most cases for a court of appeals to independently weigh evidence and grant a change of custody. The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. * * ***

*Miller*, 37 Ohio St.3d at 74. (Citations omitted.)

{¶21} In support of his motion to be designated Brian's residential parent and legal custodian and his motion to adopt his shared parenting plan, Clinton presented the testimony of twelve witnesses. Seven of these witnesses only provided testimony relevant to the time period involving the 2008 dependency and neglect cases in the Juvenile Court. Despite previously ruling that Clinton was required to demonstrate a "change in circumstances" had occurred since the resolution of the Juvenile Court cases returning Brian to Kristi's custody, the Magistrate permitted these witnesses to testify. The Magistrate also allowed Clinton's counsel considerable leeway to extensively question these witnesses regarding the situation giving rise to the dependency and neglect actions.

{¶22} Specifically, the evidence revealed that in May of 2008, while Brian was residing with Kristi and Clinton's mother, Brian's paternal grandmother, and while Clinton was still living in Georgia, the Findlay Police Department found then four-year-old Brian wandering the neighborhood streets unsupervised by an

adult. After further investigation, it was revealed that Brian had wandered off from his grandmother who was supposed to be watching him while Kristi was at work. The responding officer returned Brian to the home and spoke with the grandmother. Although Brian appeared to be in good health, the officer observed the grandmother to be "very low functioning" and having trouble answering simple questions. (Tr. at 131). The officer also noticed the poor condition of the home, specifically that the inside was extremely cluttered with trash, rotten food, and toys. The officer took photographs of the home which were admitted as exhibits at the hearings. The officer stayed at the home until Kristi returned from work and requested that child endangerment charges be filed against her. CPSU became involved with the case and Kristi eventually pled no contest to the charge. Brian remained in Kristi's care.

{¶23} In December of 2008, the Findlay Police were called to the home regarding the death of Clinton's mother due to hypothermia. Clinton was still living out of state at the time. According to the testimony of the responding officer, the condition of the home was deplorable with trash and rotten food scattered throughout, burst radiators, and nonfunctional toilets which were filled with frozen feces and urine. There was also no running water or heat except for a space heater. Photographs taken of the home were admitted as an exhibit at the hearings. As noted by the Magistrate, the conditions depicted in the photographs

"were, in short, horrible living conditions for children and adults." (Doc. No. 169 at 3). CPSU subsequently removed Brian from the parties' custody and placed him with Kristi's mother.

{¶24} Both the CPSU caseworker and the GAL assigned to the 2008 Juvenile Court cases provided testimony in the 2012 Domestic Relations custody case. The testimony from these witnesses revealed that as part of the case plan during the dependency and neglect proceedings, Clinton and Kristi both underwent a psychological evaluation conducted by Dr. Darlene Barnes. Clinton's counsel questioned these witnesses about the content of Dr. Barnes' 2009 evaluation of Kristi. The GAL recalled that both parties were diagnosed with personality disorders, including obsessive compulsive and schizo-typical traits. The testimony revealed that Dr. Barnes recommended that both parties receive counseling—specifically, that Kristi engage in "brief counseling" and Clinton engage in "individual therapy particularly with grief counseling and for his dealing with the loss of his mother and the loss of the marriage." (Tr. at 448-449). Testimony from additional witnesses at the custody hearings revealed that both Kristi and Clinton received counseling as a consequence of the Juvenile Court proceedings.

{¶25} Both the CPSU caseworker and the GAL acknowledged their initial concerns with Kristi's ability to provide the appropriate care for Brian based on

the condition of her home at the time of Brian's removal in December 2008. However, as the GAL's testimony established, the condition of Kristi's home greatly improved during the course of the Juvenile Court proceedings. The GAL testified that as the case progressed she had no concerns with Kristi's ability to maintain an appropriate home for Brian. The GAL also testified that her last contact with the parties was in April of 2010 and that her final recommendation was that Brian should remain in Kristi's custody with Clinton having parental visitation.

{¶26} At the time of the evidentiary hearing in the Domestic Relations case in 2012, Clinton lived in Findlay, Ohio, and Kristi and Brian lived nearby in Arlington where Brian attended school and had just completed the second grade. Brian's first grade teacher, Lisa Haught, testified that Brian was in her classroom during the 2010-2011 school year. She described Brian as a bright child with some emotional problems. Specifically, Ms. Haught recalled Brian throwing temper tantrums, in which he would pull his own hair, bang his head on the desk, and refuse to participate in classroom activities. She testified that Brian was sent to the Principal's office at least a dozen times because of his disruptive behavior and that Brian regularly met with the school counselor in an effort to address some of his behavioral issues. She noticed that many times Brian appeared to be very tired and would put his head down on his desk and not want to do classwork. She

also observed that Brian struggled socially and did not have a lot of friends. Ms. Haught recalled that near the end of the school year Brian's behavior began to improve. She explained that at that time she had a "transition meeting" with Brian's second grade teacher, Ms. Begg, where they discussed the areas of concern with Brian and strategized how to help him improve the following school year.

{¶27} Ms. Haught also remembered both Kristi and Clinton attending parent-teacher conferences and they both responded to the notes she wrote on Brian's homework log. She recalled speaking to Clinton on the phone on more occasions than with Kristi regarding Brian's behavior and that Clinton would meet with her after school to check on Brian's progress with his behavior in class.

{¶28} Bonnie Begg, Brian's second grade teacher, testified that she was Brian's current teacher at the time of the 2012 Domestic Relations hearings. She recalled that Brian had "meltdowns" during the beginning of the school year but that he continued to see the school counselor once a week and his behavior greatly improved. She testified that the school counselor was working with Brian on his socialization and that she noticed Brian has "really come a long way" with forging social relationships with the other children. (Tr. at 53). Ms. Begg stated that Brian had not been sent to the Principal's office all year and that he was doing

well academically. She testified that overall Brian "has grown a lot" during the school year. (Tr. at 68)

{¶29} Ms. Begg testified that Clinton frequently corresponds with her via e-mail to check on Brian's progress and that Kristi had participated in parent-teacher conferences, reading week, and classroom holiday parties.

{¶30} Chelsea Bodnarik, the Principal of the elementary school that Brian attended, also testified. Ms. Bodnarik recalled that during the 2010-2011 school year Brian was in her office for disciplinary reasons on more occasions than the average first grader. She relayed her concerns to both Kristi and Clinton regarding Brian's behavior and recommended that they seek outside counseling for him. Ms. Bodnarik did not know if the parents followed through with her recommendation. However, she stated that she had no ongoing concerns with Brian's behavior as a result of his growth during the 2011-2012 school year. She noted that Brian had worked hard to improve his behavior in the classroom and that he also showed improvement with appropriately socializing with his classmates. She believed that Brian's regular sessions with the school counselor were very beneficial and saw less of a need for Brian to receive outside counseling than she did the previous year.

{¶31} Kristi and Clinton also provided testimony at the hearing. Kristi testified that Brian resumed living with her in her apartment in Arlington in

September of 2009. She admitted pleading no contest to a child engenderment charge as a result of the May 2008 incident. She also acknowledged that the conditions of the home giving rise to CPSU's removal of Brian from her care in December 2008 were inappropriate and unsafe and took responsibility for her actions in creating the situation. Kristi testified that her housekeeping has improved since the 2008 Juvenile Court proceedings. She stated that for the last two years she maintained full-time employment at McDonald's in Bluffton and had even been promoted to department manager. She stated that she works forty hours a week and her shift begins at 7 a.m. and ends at 3 p.m. She explained that during the week while she is at work Brian goes to Good Hope child-care center before and after school. The child-care center is located next to the elementary school and ensures that Brian gets to and from school. Kristi stated that when she works Saturdays, Clinton watches Brian. Brian also stays with Clinton every Tuesday overnight and on alternating weekends.

{¶32} Kristi believed that Brian had adjusted well to the school in Arlington and stated that Brian was looking forward for school to resume in the Fall. Brian was also involved with the Royal Rangers, which is a church group similar to the Boy Scouts.

{¶33} Kristi stated that she and Clinton talked daily on the telephone. She explained that the majority of these phone conversations are initiated by Clinton

and that he calls her four to five times a day. She recalled that some content of the conversations focuses on Brian, but oftentimes Clinton would ask "irrelevant" questions that do not concern Brian. (Tr. at 510). She expressed discomfort with some of these conversations and explained that she divulged information just to "appease" Clinton. (Tr. at 511). She stated that Clinton's attitude toward her changes negatively if she does not answer all his questions.

{¶34} Kristi testified that in her opinion shared parenting was not in Brian's best interest because it would be disruptive to his schedule. She also expressed uncertainty with the "level of communication" between she and Clinton to be able to "facilitate" shared parenting objectives. (Tr. at 201). She believed that Clinton should seek counseling for his anger issues toward her and stated that he has a tendency of "letting his anger get the best of him in certain conversations" and this creates an obstacle in their ability to effectively communicate. (Tr. at 208).

{¶35} Clinton testified that he lives in a small apartment in Findlay. Much of Clinton's testimony focused on the circumstances surrounding the 2008 dependency and neglect proceedings in the Juvenile Court. He believed that CPSU created a bias against him in handling the cases. Clinton's testimony also focused on Dr. Barnes' 2009 psychological evaluation of Kristi and his opinion on how that assessment continues to affect Kristi's personality and her ability to parent.

{¶36} Regarding the evidence of the circumstances contemporary to the hearing, Clinton testified that he is employed by a contract security company engaged by Marathon Petroleum and works 8 a.m. to 4 p.m., Monday through Friday. He stated that he and Kristi communicated well for the most part and he is able to discuss parenting matters with her. However, Clinton constantly criticized Kristi's parenting skills on the stand.

{¶37} Clinton also recalled an instance in November 2010 when Kristi took Brian with her to work on a Saturday because she did not have child care previously arranged. At that time, Clinton was still working on Saturdays. Clinton left work to observe if Kristi could adequately supervise Brian while she worked. Clinton arrived to Kristi's work shortly after she began her shift. He then called the Bluffton Police concerned for Brian's safety. The responding officer investigated the situation and discovered that one of Kristi's co-workers was going to take Brian home and determined there was no immediate concern for Brian's safety. When the responding officer declined to get further involved in the domestic matter, Clinton lodged a complaint with the Police Department expressing his dissatisfaction with the officer's conduct. Clinton's letter to the Bluffton Police Chief regarding the situation was admitted as an exhibit at the 2012 Domestic Relations hearing. In this letter, Clinton recounted the conditions

preceding the 2008 Juvenile Court cases and claimed the officer failed to view the situation "objectively." (Ex. J).

{¶38} Clinton testified that he believed that either designating him as Brian's residential parent or adopting his shared parenting plan would be in Brian's best interest because Kristi "freezes" him out of the decision making process regarding Brian. (Tr. 297). He also stated that Brian did not get enough sleep in Kristi's care and that he did not get enough socialization. He believed that Kristi fed Brian too much junk food and not enough vegetables. Clinton also stated that Brian needed a "fresh start" and that enrolling Brian in Findlay schools would greatly benefit him. (Tr. 313).

{¶39} The GAL assigned to the 2012 Domestic Relations case filed a report which was admitted as an exhibit of the court. The GAL acknowledged the horrendous circumstances giving rise to the 2008 dependency and neglect proceedings, but focused his report on the situation relative to the time of the 2012 Domestic Relations case. The GAL visited both parties' homes. The GAL observed Kristi's apartment to be cluttered and untidy, but nothing reminiscent of the conditions in 2008. He also noted that Clinton's apartment was extremely small and adequate for Brian's visitations but questionable as a residence for him.

{¶40} The GAL was struck by the fact that Clinton reminded him of Dr. Barnes' 2009 evaluation of Kristi as a schizophrenic in every interaction he had

with Clinton, even providing him literature on certain characteristics of the mental illness. The GAL noted that Brian at one point told the school counselor that his mother was "crazy" and that "he may be crazy." (Court's Ex. A at 9.) The GAL surmised that Clinton was "either directly or perhaps inadvertently" the source of Brian's disparaging remarks based on the interactions the GAL had with Clinton. (Id.). The GAL observed that, despite Clinton's focus on her assessment of Kristi, Dr. Barnes had made similar diagnoses of both Kristi and Clinton in her 2009 evaluations. In general, the GAL observed Clinton to be much more negative about Kristi than she is about him. The GAL expressed a deep concern regarding Brian's lack of socialization and noted that it appeared to be an issue while he was in the care of both parties. The GAL also spoke to Brian's teachers and the school counselor in Arlington and noted Brian's improvement during the past school year. The GAL recommended Kristi remain Brian's residential parent and legal custodian. The GAL specifically stated the following conclusion:

> **Based upon all of the foregoing, the Guardian, with a fair amount of reluctance, believes that it would be in Brian's best interest to keep Kirsty [sic] as the residential parent. That is primarily focused upon that setting as providing the best opportunity to further Brian's social skills when admittedly, this home has not worked well to this point to foster. There is no concrete plan before the Guardian as to how the father would deal with that issue which the Guardian believes is a necessity because it would serve Brian's best interest to remain in the Arlington School District. It is the Guardian's belief that if the father was named residential parent and Brian was placed in the Findlay City Schools, that would be a setback from [sic] Brian**

> **given the limited circle of friends Brian has with less opportunity in dad's setting to socialize with children his age. The situation should be monitored because it's the Guardian's hope that this serves as a wakeup call to mom and perhaps she can mend her ways and deal better with her son's needs and have him interact with his peers better than she has to date. If in fact she responds to this call, that would indeed serve Brian's best interest, which is ultimately what these proceedings are about.**

(Court's Ex. A at 12-13.)

{¶41} After the close of the hearings, the Magistrate interviewed Brian. Brian stated that he enjoyed school and his friends there. The Magistrate observed that Brian was able to express his general understanding of the dispute between his parents and their involvement with the court process. Brian stated that he wanted more time with his father to make it more "fair." (Tr. at 19). Brian acknowledged that his father had continued to tell him that the current visitation arrangement was not fair. Brian felt he needed to devise an equal time-sharing plan to make it "fair" for his father. (Id.)

{¶42} In applying the best interest factors set forth in R.C. 3109.04(F)(1), both the Magistrate and the trial court determined that it was in Brian's best interest to designate Kristi as his residential parent and legal custodian. In support of their decisions, the Magistrate and the trial court specifically noted Clinton's negative attitude toward Kristi coupled with his fixation on her mental health evaluation conducted three year prior, and his statements to Brian regarding the fairness of the current custody arrangement. The Magistrate and the trial court

-22-

were both struck by the fact that Clinton used the 2012 custody hearings as an opportunity to relitigate circumstances involving the 2008 dependency and neglect proceedings.

{¶43} However, both the Magistrate and the trial court observed that despite any animosity Clinton may harbor towards Kristi, the parties demonstrated that they are able to communicate effectively regarding parenting Brian and continued to handle custody exchanges without issue. Both the Magistrate and the trial court noted the extremely positive effect the Arlington school had on Brian's socialization and behavioral issues and the fact that since the conclusion of the Juvenile Court proceedings Brian's relationship with Clinton had greatly developed as the two were able to spend more time together under the current custody arrangement between the parties. Moreover, while acknowledging Kristi's lack of good judgment which precipitated the 2008 dependency and neglect actions, the Magistrate and the trial court also noted that Kristi had worked to successfully improve upon her parental inadequacies since the culmination of the Juvenile Court proceedings.

{¶44} In addition, it is clear that in her interactions with parties during the course of the 2012 Domestic Relations hearings, the Magistrate observed a particular dynamic between the two parents and expressed her concern with either designating Clinton as Brian's residential parent and legal custodian or adopting

Clinton's motion for shared parenting. Specifically, the Magistrate found as follows:

> **Given the Father's attitude toward the Mother and his continued focus on the events of 2008-2009, the Magistrate cannot conclude that shared parenting is appropriate or in Brian's best interest. The Mother remains willing to facilitate the Father's parenting time, despite his unsubstantiated claims that she "freezes him out." She has not always initiated contact because of the content of communications with him, but she has cooperated in the increased parenting time since the temporary order was entered on February 17, 2012 and commencing in January 2012. That has facilitated child-care during the Mother's work hours. The Father, on the other hand, calls her repeatedly to check up on her, requiring her to answer questions about their meals and other matters; he continues to call and leave messages before she has an opportunity to return his calls. These circumstances indicate that placing the parents on legal equal footing through shared parenting will result in the diminution of the Mother's role. The Father is demanding and distrustful of the Mother and others who have been in contact with Brian, filing and lodging complaints, while the Mother is passive in her parenting and responses to the Father, which characteristics will not permit equal parenting. The Father's conduct indicates his failure to recognize boundaries. Although legitimately concerned for his son, with or without the history with CPSU, the Father does not recognize boundaries of divorce and separate households. He makes repeated calls, stating that the parties have talked daily ever since they were married and that they should go to counseling "as a family."**

(Doc. No. 169 at 21-22).

{¶45} On appeal, Clinton maintains that Brian has not thrived while in Kristi's care and that she is unwilling to allow him to have more parenting time. However, we concur with the rulings of the Magistrate and the trial court that the

-24-

record simply does not support Clinton's contentions. Rather, the record establishes that Brian has greatly improved socially and behaviorally while in Kristi's custody, attributable in large part to the active role the Arlington school played, and that both parties have been able to successfully implement a custody arrangement which expanded Clinton's parenting time with Brian. Moreover, we would note that the custody order put into place by the trial court further expands Clinton's parenting time with Brian and the evidence in the record of the parties' past conduct suggests that Kristi will accommodate Clinton's extended parenting time without issue. Based on the foregoing discussion, we conclude that the Magistrate and the trial court properly applied the best interest factors enumerated in R.C. 3109.04(F)(1) and therefore, we find no error with the decision to designate Kristi as Brian's residential parent and legal custodian.

{¶46} Clinton also argues on appeal that the Magistrate erred in her December 9, 2012 ruling when she determined that the 2009 disposition of the Juvenile Court in the dependency and neglect proceedings was a prior allocation of the parties parental rights and responsibilities and that a "change in circumstances" as set forth in R.C. 3109.04(E) needed to be established as a threshold matter in order to modify that prior order. Clinton further asserts that the trial court erred when it failed to sustain his objection to the Magistrate's decision on this basis.

**{¶47}** We note that despite the Magistrate's previous ruling that a prior allocation of the parties' parental rights and responsibilities had been made, both the Magistrate and the trial court applied only the "best interest" standard which is consistent with the analysis to be applied when no prior allocation of parental rights and responsibilities has been made. And as noted above, both the Magistrate and the trial court properly applied the factors set forth in R.C. 3109.04(F)(1) in reaching the conclusion that it was in Brian's best interest to designate Kristi as his residential parent and legal custodian.

**{¶48}** We would also note that despite ostensibly ruling that a "change in circumstances" was a threshold issue, the Magistrate did not specifically conclude that a "change in circumstances" was present or absent for purposes of the R.C. 3109.04(E) analysis, but noted that a "change in circumstance" had occurred in Clinton's and Brian's relationship—more specifically that in 2009 Clinton had re-established a relationship with Brian after having very little contact with him the preceding two years, which presumably had a positive effect on all parties involved.

**{¶49}** Moreover, we would note that, despite her prior ruling that she would consider only the "change in circumstances" after the return of Brian to Kristi in 2009, the Magistrate permitted Clinton to present the testimony of nearly all of the individuals involved in the 2008 dependency and neglect proceedings. In fact,

these witnesses' testimony comprised the majority of the evidence presented by Clinton in support of his 2012 custody case. The Magistrate also allowed Clinton's counsel considerable latitude to question these witnesses regarding the circumstances precipitating the 2008 Juvenile Court cases and the parties' progress through those case proceedings. Thus, it is apparent from the record that the Magistrate's previous order regarding the applicability of a "change in circumstances" inquiry did not create an obstacle for Clinton to present evidence of the circumstances prior to the 2009 disposition of the Juvenile Court returning Brian to Kristi's custody.

{¶50} For all these reasons, we do not need to address whether the Magistrate erred in ruling that a "change in circumstances" standard would be applied to this case because the Magistrate and the trial court both fully engaged in a "best interest" analysis which Clinton maintains is the appropriate legal standard, and Clinton has failed to demonstrate any prejudice to his case as a result of the Magistrate's prior ruling regarding a "change in circumstance" analysis.

{¶51} Finally, Clinton argues that the trial court erred in failing to sustain his objection to the Magistrate's determination that Dr. Darlene Barnes' testimony was not admissible. The record indicates that Clinton's counsel filed a subpoena for Dr. Barnes to testify at the May 31, 2012 hearing. However, the subpoena was for the wrong date of May 21, 2012. Testimony from the assistant to Clinton's

counsel established that the assistant had contacted Dr. Barnes to advise her of the error on the subpoena. At this time, Dr. Barnes informed the assistant that she did not plan on attending the hearing because she did not feel that she could give "a clear consistent recommendation" given the fact that her report was completed three years earlier. (Tr. at 406). The assistant also testified that the appearance and mileage fees were not tendered to Dr. Barnes with the subpoena.

{¶52} Clinton's counsel requested the Magistrate issue an order for Dr. Barnes to appear and show cause for failure to appear pursuant to the subpoena. In her June 4, 2012 Order, the Magistrate denied this request finding that the subpoena did not comport with the requirements of Civ.R. 45(B). Specifically, the Magistrate stated that "[b]ased on the erroneous date, the failure to advance fees for attendance, and the absence of a return service, the Magistrate concludes that the witness cannot be mandated to appear on a 'show cause' order." (Doc. No. 137 at 2). In the same order, the Magistrate also determined that Dr. Barnes' 2009 evaluation of Kristi was inadmissible because there was no proffer of any recent psychological evaluation for comparison and the 2009 evaluation was not relevant to the "change in circumstances" inquiry set forth in R.C. 3109.04(E). However, the Magistrate specifically stated in the order that her ruling was preliminary and subject to reconsideration "upon the presentation of additional evidence establishing some relevance of the prior evaluation." (Doc. No. 137 at 4).

{¶53} As previously discussed, the Magistrate permitted Clinton's counsel to question several witnesses regarding specific content of Dr. Barnes' 2009 evaluation of Kristi. As noted by the trial court in its decision overruling Clinton's objections, "despite refusing to admit the psychological evaluation, the Magistrate heard extensive testimony and read numerous pleadings, entries, and orders from the parties' juvenile case to understand that Mother was diagnosed with mental illnesses which have affected her ability to properly care for Brian in the past." (Doc. No. 191 at 13). Notably, the Magistrate admitted Dr. Barnes' 2009 evaluation of Kristi at the hearings for the limited purpose as a record kept by CPSU, and discussed the diagnoses made in that evaluation in addressing the best interest factor R.C. 3109.04(F)(1)(e), which directs the factfinder to consider the mental health of all persons involved in the situation.

{¶54} On appeal, Clinton maintains that Dr. Barnes' 2009 evaluation was relevant to demonstrate that the personality disorders Kristi was diagnosed as having "are not situational, but rather the symptoms of the personality disorder are ongoing and permanent." (Appt. Brief at 6). Clinton provides no authority or expert opinion to support this argument. Nevertheless, we find it compelling that the reason Dr. Barnes apparently gave for not being willing to comply with the subpoena was that her evaluation was completed three years prior—thus, reaffirming the Magistrate's position that the 2009 evaluation was not relevant to

the 2012 custody proceedings absent a more current evaluation for comparison. Notwithstanding this fact, the evidence presented at the hearings demonstrated that Kristi had made considerable improvements in her ability to recognize and maintain a safe, sanitary, and appropriate home for Brian since the 2009 disposition made by the Juvenile Court, and therefore further disavowing Clinton's contention on appeal that the diagnoses made by Dr. Barnes in 2009 regarding Kristi's mental health are somehow permanent in nature and not capable of amelioration. Accordingly, we do not find that the trial court erred in failing to sustain Clinton's objection to the Magistrate's determination regarding the admissibility of this evidence.

{¶55} For all the reasons stated above, the assignments of error are overruled and the judgment is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**